WILLIAM M. NARUS, CAB #243633
Acting United States Attorney
District of Oregon
**MEREDITH D.M. BATEMAN, OSB #192273**
Meredith.Bateman@usdoj.gov
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 3:19-cr-00229-SI |
| v. | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **OSCAR PETERS,** | |
| Defendant. | |

**I.   Introduction**

Over two years, defendant Oscar Peters operated from abroad to create a false billionaire-businessman persona to trick Adult Victim 1 ("AV1") into believing they were in love and sending him over $1.8 million.  The parties and Probation jointly recommend that the Court sentence defendant to 37 months in prison to hold him accountable for his long-term, pervasive, and heartbreaking scheme.

**II.   Procedural Posture**

On June 4, 2019, the grand jury charged defendant via indictment with seven counts of wire fraud in violation of 18 U.S.C. § 1343 and the Court issued an arrest warrant the next day. On April 9, 2020, defendant was arrested in the United Kingdom pursuant to a request for his

provisional arrest submitted by the government in September 2019. On April 29, 2020, Judge You signed the government's extradition request. Defendant spent the next three years fighting extradition, asserting extradition would (1) violate his right not to be subject to torture or inhumane or degrading treatment due to the conditions in which he would be held in detention; (2) violate his right to a fair trial by reason of the "trial penalty" should he go to trial; and (3) be oppressive due to his health conditions. Defendant was eventually extradited from the United Kingdom to the United States on October 23, 2023, and made his initial appearance the following day. On March 6, 2025, pursuant to a plea agreement, defendant pleaded guilty to count 5 and admitted the forfeiture allegation. ECF No. 33.

### III.    Factual Background

Defendant met AV1 in December 2015 through Millionaire Match Maker, an online dating website. His online profile claimed he was a "[l]onely BILLIONAIRE LOOKING FOR WIFE" who had "recently sold [his] international private equity group that grew into a conglomerate of 300+ companies with offices in 35 countries and 52 cities" and who believed "[f]inding [his] soulmate . . . would be [his] crowning achievement." On December 22, 2015, defendant told AV1 his wife had "frozen [his] accounts, cards[,] everything" and that he was "paralyzed" and his "business [would] suffer." On January 8, 2016, defendant said he was "trying for first time in my life to put together 8,000 euros to go and pick stuff to get back on my feet and fight[.]" AV1 agreed to loan defendant the money stating, "I trust you! I love you, sweetheart." The same day, defendant expressed his gratitude and promised to repay 25,000 euros. AV1 sent her first two wires that day totaling over $11,000.

Over the next three years, defendant kept his facade up in all his daily emails, texts, and calls with AV1. Defendant convinced AV1 that he was a billionaire financier living in Denmark who wanted to pursue a romantic relationship with AV1. To support his lies, he claimed he had a number of wealthy former clients, including members of Middle Eastern royal families and the Vatican, and emailed photographs that purportedly showed him with these clients.

Defendant stole almost $1.9 million from AV1 by convincing her to send money in connection with his purported businesses and by getting access to her bank accounts and credit cards. Defendant claimed that he was in the midst of a contested divorce, that his "stupid evil person [wife] or thing as she is not even to be considered human" had restricted access to his money and property, and that he needed AV1's financial assistance to help him complete his business obligations with the promise of repaying it. Defendant repeatedly instructed AV1 to wire money to Larisa Orekhovskaya, his "assistant." In a few instances, defendant forwarded emails from Orekhovskaya, who requested money to fix business problems and claimed she "fought for [defendant] against that ghastly woman you married." Defendant was (at the time) married to Orekhovskaya with children, and had no businesses, no clients, and no wealth.

Defendant's atrocious lies about his financial security do not compare to the calculated way he preyed on AV1 to convince her they were in love and were to get married. He referred to her as his "wife." He repeatedly promised to come to Portland so they could be together, but something always got in the way – work, the weather, his health, or security concerns because he was traveling with Saudi royalty. Defendant often sent minute-by-minute "updates" of being on the plane, promising to be there when AV1 arrived at the airport to pick him up. He never showed up.

In total, defendant stole $1,892,439 from AV1—almost her entire life savings. He spent over $500,000 on credit cards, over $119,000 on travel, over $68,000 on limousine services and car rentals, approximately $57,000 on Apple purchases, and sent over $200,000 to his wife. Defendant's greed caused AV1 extreme emotional harm (detailed further below) and a substantial financial hardship. Among other things, AV1 repeatedly borrowed from her retirement and had to pay high penalties. AV1 told defendant of her financial worries, saying she was "really worried. I am in way over my head. If it doesn't all come through this time, I can't pay my bills and taxes. I have no room on credit cards. I can't even get a bank loan because my credit is bad because of the cc debt[.]" Defendant told her to "be calm" and then said he "was having a nice relaxed day and feeling positive now I feel like shit" and assured AV1 the money would arrive within forty-eight hours. Like defendant, the money never showed up.

## IV. The Presentence Report

On May 22, 2025, Probation disclosed its final PSR to the parties and issued its Sentencing Recommendation. There are no outstanding PSR issues for the Court to resolve.

In the PSR, Probation concluded that defendant's total offense level is a 22, calculated as follows:

| Description | No. | Guideline Section |
|---|---|---|
| Base Offense Level | 7 | USSG § 2B1.1(a)(1) |
| Loss of $1,892,439 | +16 | USSG § 2B1.1(b)(1)(i) |
| Substantial Part of Scheme Committed from Outside United States | +2 | USSG § 2B1.1(b)(10)(B) |
| **Adjusted Offense Level** | **25** | |
| Acceptance of Responsibility | -3 | USSG § 3E1.1 |
| **Total Offense Level** | **22** | |

PSR ¶¶ 34-44. The PSR concluded that defendant is in Criminal History Category I because defendant has a total criminal history score of zero. *Id.* ¶ 48.

**Government's Sentencing Memorandum**                                                                 **Page 4**

With a total offense level of 22 and a criminal history category of I, Probation determined that defendant falls within an advisory Guidelines range of 41-51 months' imprisonment. *Id.* ¶ 62. In its Recommendation Letter, Probation recommended a term of 37 months' imprisonment.

## V.    The United States' Recommended Sentence and Section 3553(a) Analysis

The United States respectfully requests that the Court impose (1) a term of imprisonment of 37 months; (2) a 3-year period of supervised release; (3) a $100 special assessment; (4) no fine; and (5) restitution of $1,892,439. The United States believes this sentence appropriately balances the nature, circumstances, and seriousness of the offense, defendant's history and characteristics and the need to provide deterrence and promote respect for the law, among other sentencing factors.

### A.  One-Level Downward Variance

The government recommends a one-level downward variance to account for defendant's waiver of motions, rights of appeal, collateral attack, and full discovery, and to account for his personal history and characteristics, particularly his medical conditions. This would result in a final offense level of 21 (37-46 months at CH1).

### B.  Nature, Circumstances, and Serious of the Offense

Romance fraud is a heartbreaking crime because it preys on loneliness and hope, and defendant's conduct is no exception. Defendant's conduct was sophisticated and specifically tailored to take advantage of the tumultuous time in AV1's life. As noted in her Victim Impact Statement, she "was the perfect prey for this predator because [her] world was in a state of chaos[.]" Knowing of AV1's recent breakup, defendant pretended he had a similar experience and then filled his emails with declarations of love and promises of marriage. When AV1 explained the financial strain the relationship was causing her ("If [the repayment] is not coming,

**Government's Sentencing Memorandum**                                                                                                           **Page 5**

you need to be honest with me so I can try to borrow money or cash out some retirement"), defendant blamed others (the market, people at a bank, or a "mole" in his circle that was sabotaging him), apologized, and played the victim ("im sorry I messed you up [but] my intentions are and have always been one hundred percent true honest and sincere" and he had "suffered" the most of everyone.). And when he repeatedly did not show up as promised, defendant yelled at AV1. Below is just one example of defendant's response to AV1 questioning why he did not show up (defendant blamed a car accident and AV1 responded "I can't believe that. Again? It's always something. You have more flat tires and car problems than anyone I know!" but then asked if the accident was bad):

> Re: ARE YOU OK???
>
> From: oscar.peters1@aol.com
> To: [redacted]
> Date: Sun, 02 Apr 2017 00:28:17 -0700
>
> Yes we had to buy a army tank at the local walmart and everyone died
> PLEASE DONT EVER DOUBTVME AND IM TOO ANGRY TIRED AND UPSET TO GO UNDER TRSTIMONY
> IF YOU DONT BELEVE THEN DONT
> AND NO WE DONT HAVE TO GET NEW CAR
> IM TIRED ANGRY TO HAVEVTO TRAVEL LIKE THIS AND HUNGRY AMD MAJOR PISSED OFF SO INDONT NEED SILLY QUESTIPNS
> BECAUSR OF STUPID SPRING BREAKS I HAVEVTO HURRY ARRANGEVSTUFF AS IF INHAD NOT ENOUGH ON MY PLATE PLUS STILL WONDERONG IF SOMEONE FOLLWING US WE STOP SWAP CARS BETWEEN US EVERY HOUR OR SO SO PLEASE DONT ASK WHYBIT TAKES LONG
> AT MY AGE AND WITH THESE CIRCUMSTANCES INSHOUD BE SOMEWHERE RELAXING NOT IN A CAR RALLY
> IM TIRED OF THIS

The next day defendant asked to use AV1's credit card to pay his phone bill. Later that month, defendant continued to prey on AV1's desire for love (AV1 in lower case and defendant in caps):

**Government's Sentencing Memorandum**     **Page 6**

> **Re: I love you**
>
> From: oscar.peters1@aol.com
> To: ███
> Date: Thu, 20 Apr 2017 23:47:06 -0700
>
> BELIEVE WE WERE BORN TO BE TO BE SOULMATES
> YOU ARE AND ALWAYS WILL BE THE LOVE OF MY LIFE AND I HOPE STAY TOGETHER EVEN I GET VERY OLD AND CANNOT WALK AND YOU CAN PUSH MY WHEELCHAIR WHEN I BECOME VERY OLD AND WE CAN LAUGH HOW WE MET AND WHAT WE WENT THROUGH TOGETHER
> I LOVE YOU NOW ALWAYS FOREVER AND BEYOND
> YOUR OSCAR ALIAS YOUR TRUE SOULMATE
> Never doubt my love for you. Sometimes I get scared with all of the "what if's." But this time, I am trusting my heart. I know you are the love of my life, my soul mate. I guess so few people ever find their true love that they don't understand what it is like when you "just know." We are blessed. We found each other, from the opposite sides of the globe, we found each other. Remarkable when you think about it. And I waited for you, as you waited for me. I love you, my brilliant husband!

This is just a small snapshot of both the financial and emotional turmoil defendant wreaked on AV1's life.

### C. Defendant's History and Characteristics

Defendant did not interview for the presentence report. Prior to his initial appearance, defendant told pretrial that he married his wife Orekhovskaya in 2000 and that they have three children who live with Orekhovskaya in France and Portugal. Defendant reported that, prior to his sentence in England in 2018, he lived in France where he worked as an investment banker and in the film production industry. Defendant reports numerous health conditions and has received treatment for heart conditions since his extradition to the United States. PSR ¶ 55.

The limited information about defendant's history and characteristics shows that his billionaire-conman persona dates to at least August 2014 when he was in the United Kingdom. He created a false online profile in which he claimed to be a billionaire financier and promised a UK company that he would invest money to expand the company. After gaining the company's trust and accessing its expense accounts, he stole over £100,000 before cutting off all communication. He spent the money on personal expenses, including hotels and flights for himself and a famous US actor. During the investigation, Interpol in London described defendant as "an international confidence trickster[.]" Defendant was arrested on December 17,

**Government's Sentencing Memorandum**                                    Page 7

2017 after being charged with fraud by false representation. After the arrest, the detective reviewed defendant's digital devices and "found other examples of fraud which he has committed around the world," but none linked to the UK so defendant could not be prosecuted there. On July 24, 2018, defendant was sentenced to three years and six months in prison.

### D. Need to Provide Adequate Deterrence, Protect the Public, and Promote Respect for the Law

A sentence of 37 months in custody will serve to deter defendant from doing anything like this again and will deter others from preying on victims online. It is notoriously difficult to bring the conductors of long-distance fraud schemes to justice because they often operate from overseas, so they are not at risk of physical apprehension, the likelihood of apprehension is reduced, and the cost of apprehension is increased. Accordingly, general deterrence is especially important in cases like this one because would-be offenders need to be put on notice that there are severe consequences for this type of criminal conduct. *United States v. Heine*, 2018 U.S. Dist. LEXIS 99922, *5-6 (D. Or. June 14, 2018) ("White collar crime is peculiarly amendable to general deterrence . . . because white collar criminals, oftentimes, premeditate their crimes and engage in a cost-benefit analysis."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence. Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment."); *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (addressing the need for general deterrence for those who might otherwise feel that some white-collar crimes are "game[s] worth playing"). Specific deterrence is also warranted here given defendant's similar conduct in the United

Kingdom and the fact that the only reason his fraud on AV1 stopped in December 2017 was because he was arrested.

The Court should send a message to any would-be romance fraudsters, wherever they operate from, that theft will land them a significant prison sentence.

### E. Need to Avoid Unwarranted Sentencing Disparities

Judiciary Sentencing Information published by the United States Sentencing Commission shows that, in the last five fiscal years, there were 479 defendants sentenced who were similarly situated to defendant and who did not receive a substantial-assistance departure. PSR ¶ 78. These defendants had a Criminal History Category of I and a total offense level of 22. *Id.* On average, those defendants received 33 months' imprisonment, and the median length imposed was 36 months. *Id.* Accordingly, a significant term of imprisonment is necessary to avoid unwarranted sentencing disparities among similarly situated defendants, and a 37-month sentence here would not create unwarranted disparity.

## VI. Restitution and Forfeiture

Defendant agreed in his Plea Agreement that he would pay $1,892,439 to AV1. ECF No. 33, ¶16. Pursuant to Federal Rule of Criminal Procedure 32.2(b)(4), the Preliminary Order of Forfeiture (ECF No. 35) becomes final at sentencing, so the government requests it be included in the judgment.

///

///

///

///

///

## VII.   Conclusion

The Court should sentence defendant to: (1) a term of imprisonment of 37 months; (2) a 3-year period of supervised release; (3) a $100 special assessment; (4) no fine; and (5) restitution of $1,892,439.

Dated: May 28, 2025                              Respectfully submitted,

WILLIAM M. NARUS
Acting United States Attorney

*/s/ Meredith D.M. Bateman*
MEREDITH D.M. BATEMAN, OSB #192273
Assistant United States Attorney